NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0613n.06

Nos. 16-4254

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DEBORAH HAGEDORN,                          )
                                           )
       Plaintiff-Appellant,                )
                                           )
v.                                         )      ON APPEAL FROM THE
                                           )      UNITED STATES DISTRICT
DAVID CATTANI; GEOFFREY ESSER,             )      COURT FOR THE NORTHERN
                                           )      DISTRICT OF OHIO
       Defendants-Appellees,               )
                                           )
DAVID PHILLIPS,                            )
                                           )
       Defendant.                          )

FILED
Nov 07, 2017
DEBORAH S. HUNT, Clerk

BEFORE: GIBBONS, KETHLEDGE, and DONALD, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Deborah Hagedorn alleges that three local officials in Timberlake, Ohio—David Cattani, Geoffrey Esser, and David Phillips—improperly pursued criminal charges against her in retaliation for her criticism of the village government. Hagedorn sued Cattani, Esser, and Phillips for First Amendment retaliation under 42 U.S.C. § 1983 as well as violations of Article I, Section 11 of the Ohio Constitution. The district court granted summary judgment to the officials on all counts. We affirm.

I.

A.

Timberlake, Ohio, is a small village of six- to seven-hundred residents just north of Cleveland along the shores of Lake Erie. David Cattani served as Timberlake's mayor from January 2012 through December 2015. Although Timberlake contracts with nearby

municipalities for many services, it maintains a small police force. David Phillips was the police chief until he was removed from office in October 2013. At that point, Geoffrey Esser, an officer in the department, was named acting chief.

Deborah Hagedorn lived in Timberlake from May 2001 until April 2016. In late 2012, Hagedorn came to believe that the Timberlake Police Department was engaged in an "aggressive [traffic] ticketing campaign" along a thoroughfare that connected Timberlake with nearby communities. DE 55-1, Hagedorn Decl., Page ID 1512. She began investigating how the village was using any additional traffic-ticket revenue. In the course of her investigation, Hagedorn uncovered evidence that Phillips was abusing his powers as police chief for his own financial gain.[1]

## B.

On July 11, 2013, Hagedorn engaged in surveillance of the village's service garage to monitor Phillips' activity. When Hagedorn arrived at the service garage early that morning, she waited outside because the door to the garage was locked. At approximately 6:35 a.m., Esser, while on a routine patrol of the village, encountered Hagedorn at the garage. In a police report documenting this encounter, Esser stated that shortly after he arrived at the garage, Hagedorn "jumped in front of [his] vehicle from a weed and brush covered area behind the East side of the building[.]" DE 44-4, Esser Police Report, Page ID 753. Hagedorn was pointing a device at Esser that he believed to be either a phone or a camera. Esser's report describes what happened next:

---

[1] Hagedorn places great emphasis on her interactions with village officials in the course of her investigation to argue that these officials acted with a retaliatory motive. Because our decision rests on a determination that there was probable cause for the disorderly conduct and telecommunications-harassment charges (and not on whether the village officials acted with a retaliatory motive), we need not review the entirety of what occurred. To the extent it is helpful, the district court opinion provides an accurate and comprehensive account of the background. We will, however, summarize the events surrounding each criminal charge.

> I immediately exited my vehicle and asked her what she was doing. Hagedorn replied saying, I know what your [sic] doing, I know what you guys are up to, and then pulled her bicycle out from the same area she was concealing herself behind the building. I explained that I was checking the building, that I regularly perform checks of the building, and again asked her what she was doing in that area. Hagedorn got on her bicycle laughed, called me officer Esser, began yelling, swearing, and told me that I'm an "Asshole". I advised her not to be disorderly and explained that if anything was taken or damaged, her presence would make her the suspect and advised her to stay out of the area. She continued laughing and yelling as she rode away telling me that I'm an "idiot[.]"

*Id.* Esser then confirmed that there was no sign of attempted forced entry and no damage to the garage. As he was preparing to leave, Hagedorn returned and "demanded" that Esser open the garage to show her what was inside. *Id.* Esser refused to do so and began telling Hagedorn that he would be "generating a report about the situation," but she "began laughing and yelling as she left the area." *Id.*

Esser asserts that he had "no intention" of citing Hagedorn at the time of the incident. DE 44-3, Esser Decl., Page ID 748. He claims that he created a police report "simply to memorialize for the record what had transpired because [Hagedorn] has been known to make unsubstantiated allegations." *Id.* Shortly after the incident, however, a resident called the police to make an anonymous report of a "disturbance in the service garage area" because "a female was yelling at someone and calling them names[.]" DE 44-4, Esser Police Report, Page ID 753. Esser spoke with the caller and confirmed that the disturbance was his exchange with Hagedorn. The caller later identified himself to police as George Transky, a Timberlake resident who lived near the service garage. Esser presented Transky's complaint to Timberlake prosecutor Michael Germano, who reviewed the allegations and charged Hagedorn with disorderly conduct. Three days after the incident, Hagedorn received a citation for Village of Timberlake Codified Ordinance § 648.04(a)(2).

Hagedorn's case, *State of Ohio v. Hagedorn*, No. 13-CRB-02427, proceeded to a bench trial before a Willoughby Municipal Court magistrate. After hearing testimony from Esser, Transky, and Hagedorn, the magistrate held that although there was sufficient probable cause to charge Hagedorn, he was obligated to acquit Hagedorn "based on all the elements and offense and the situation and the fact that it was between Ms. Hagedorn and [an] officer," and because "calling an officer an asshole is protected speech." DE 18-1, Trial Tr., Page ID 188–89.

C.

As a result of her email exchanges with Cattani between October 2014 and July 2015, Hagedorn was also charged, on four occasions, with telecommunications harassment pursuant to Ohio Rev. Code § 2917.21(A)(5). The issue was Hagedorn's continued use of Cattani's personal email address after Cattani asked her to stop contacting him at that account and instead to use his village address if she needed to contact him in his capacity as mayor.

From the time Cattani was first elected to the town council in 2006, all emails sent to Cattani's village email address were automatically forwarded to his personal account. When Cattani responded to those messages, the recipient received a message from his personal email address. In October 2013, Cattani started forwarding his village emails to a different personal Gmail account. He did so because Gmail allowed him to use his village email address, instead of his personal email address, when responding to messages. Cattani states that doing so also allowed him to use his village account for all village business and his personal account only for personal matters.

Prior to October 2014, Hagedorn and Cattani exchanged emails using his personal address. At 1:26 p.m. on October 30, 2014, however, Cattani notified Hagedorn that, "effective immediately, [he would] no longer be viewing or responding to any mail sent to [his personal

account]." DE 44-6, Ex. E to Cattani Decl., Page ID 757. Cattani instructed Hagedorn to "direct all communications to [his village account]." *Id.* The parties agree that this was the first time Hagedorn received notice of Cattani's preference that she no longer contact him at his personal address. Cattani subsequently sent four more emails to Hagedorn advising her not to contact him at his personal address. He emailed her twice on November 18, 2014, again on December 15, 2014, and a final time in May 2015.

Although Hagedorn clearly had notice of Cattani's request—she replied directly to multiple emails in which Cattani asked her to stop emailing his personal account—and although Hagedorn knew how to email Cattani at his village email address—she did so on multiple occasions after his initial request—she continued to send email to his personal account. Between October 30 and January 6, Hagedorn sent fifteen emails to Cattani's personal account. Many of the emails from Hagedorn related to requests for public records, questions about village operations, and her thoughts on the village police department. Two of the fifteen involved what could be described as personal attacks on Cattani and his family.[2]

In January 2015, Cattani filed a complaint with the Timberlake Police Department, outlining his email exchanges with Hagedorn. He stated that he felt personally harassed and was "at a loss on how to deal with this woman," because:

> I have persistently advised her to not contact me at my personal account since October, 2014. I want her harassment to stop, and I ask that the criminal courts assist me in this simple goal. I will not suffer another year of her dangerous and irrational behavior.

DE 46-1, Cattani Interrog. Resp., Page ID 887. The police presented this complaint to Germano for his review. Germano advised that there was probable cause for telecommunications

---

[2] The parties concede that the content of the emails constituted protected speech and that Cattani provided notice to Hagedorn of his desire not to be contacted at his personal email address. Thus, we do not recount the specifics of their exchanges. The record, however, provides a comprehensive summary.

harassment, a violation of Ohio Rev. Code. § 2917.21(A)(5). On January 27, 2015, Timberlake Police Officer Robert Hutchinson presented an affidavit to the Willoughby County judge, who found probable cause for telecommunications harassment and issued a warrant for Hagedorn's arrest. This first case was captioned *State of Ohio v. Deborah Hagedorn*, Case No. 15-CRB-310.

Hagedorn sent six more emails to Cattani's personal email account between January 14, 2015 and February 13, 2015. Three of the emails involved public-record requests; one was a request to connect on LinkedIn; and two purported to complement Cattani for his actions as mayor. The police presented this information to Germano, who again advised that he believed there was probable cause for a telecommunications-harassment charge. A Willoughby County judge agreed and issued a second warrant for telecommunications harassment—Case No. 15-CRB-850—in March 2015 upon an affidavit from Hutchinson.

In April 2015, both of the pending cases against Hagedorn—15-CRB-310 and 15-CRB-850—were dismissed.

In May, June, and July of 2015, Hagedorn sent another five emails to Cattani's personal account. These emails all involved pending records requests. (Cattani presented this evidence to the police, who passed it along to Germano. Germano recommended a third and fourth telecommunications-harassment charge based on his belief that there was probable cause. The judge agreed, issuing warrants for Case Nos. 15-CRB-2286 and 15-CRB-2575.

Hagedorn went to trial on these charges in January 2016. Cattani testified that he viewed the emails as a personal attack and stated that he was trying to "create a wall" between official and personal correspondence. DE 59-2, Trial Tr., Page ID 1724. He explained that his problem with the emails was not the content but the fact that he was receiving them at his personal email address. In her testimony, Hagedorn acknowledged sending several emails to Cattani's personal

account but stated that it was an accident—that she pushed the wrong button or selected the wrong address from those she had stored on her phone. She denied sending email to Cattani for the purpose of harassing him. Hagedorn was acquitted by a jury on all counts.

II.

Hagedorn sued Cattani, Esser, and Phillips, alleging that they had pursued criminal charges against her without probable cause on five separate occasions—the disorderly conduct charge and four telecommunications-harassment charges—because she had engaged in protected speech. She claimed that this constituted First Amendment retaliation under 42 U.S.C. § 1983 and violated her rights under Article I, Section 11 of the Ohio Constitution. The district court granted defendants summary judgment on all of Hagedorn's claims. As to the state-law claims, it held that Ohio does not recognize a private cause of action for the free-speech rights in Article I, Section 11 of its Constitution. In considering Hagedorn's § 1983 claims, the district court held that Hagedorn had not established a constitutional violation because each criminal charge was supported by probable cause and because there was no evidence of a retaliatory motive. Hagedorn filed a timely notice of appeal. We subsequently dismissed the claims against David Phillips after receiving notice that he passed away in October 2016.

III.

We review a district court's grant of summary judgment *de novo*. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "construe all reasonable inferences in favor of the nonmoving party," *Ramsey v. Penn Mut. Life Ins. Co.*, 787 F.3d 813, 818 (6th Cir. 2015) (citation omitted), and ask whether the evidence—viewed in the light most favorable to

the nonmoving party—presents a question of fact sufficient to require submission to a jury, or whether it "is so one-sided that the moving party must prevail as a matter of law," *Martin Cty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 593 (6th Cir. 2013) (citation omitted).

## IV.

We begin with Hagedorn's § 1983 claims. Esser and Cattani both assert a defense of qualified immunity. It is Hagedorn's burden to establish that they are not entitled to such immunity. *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006). We evaluate qualified immunity by asking (1) was there a violation of a constitutional right; and (2) was that right "clearly established" at the time the violation occurred. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 485 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

To establish a First Amendment retaliation violation, Hagedorn must show that she was engaged in protected speech, was subject to an adverse action that would deter a reasonable person from continuing to engage in such speech, and that her speech was at least part of the motivation for the adverse action. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 399 (6th Cir. 2016) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*)). She must also show an absence of probable cause for the underlying criminal charges. *Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 265–66 (2006), and *Barnes v. Wright*, 449 F.3d 709, 720 (6th Cir. 2006)).

## A.

With respect to the disorderly conduct charge, Cattani cannot be liable under § 1983 because there is no evidence to suggest—and Hagedorn does not allege—that he was in any way involved in the decision to pursue the charge.

Esser is entitled to qualified immunity because there was probable cause to charge Hagedorn with disorderly conduct. Probable cause exists where "facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (alteration in original) (internal quotation marks and citation omitted). We conduct an independent and objective analysis of whether probable cause exists, examining "all facts and circumstances" known at the time. *Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007) (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)).

Hagedorn was charged with disorderly conduct in violation of § 648.04(a)(2) of the Timberlake Codified Ordinances. The ordinance provides, in relevant part, that "[n]o person shall recklessly cause inconvenience, annoyance or alarm to another by . . . [m]aking unreasonable noise or an offensively coarse utterance, gesture or display, or communicating unwarranted and grossly abusive language to any person." This language mirrors the State of Ohio's disorderly conduct statute. *See* Ohio Rev. Code § 2917.11(A)(2).

Although the Ohio Supreme Court has limited prosecutions under § 2917.11(A)(2) for making an "offensively coarse utterance" or "communicating unwarranted and grossly abusive language to any person" to situations involving "fighting words," *see State v. Hoffman*, 387 N.E.2d 239, 242 (Ohio 1979); *Kinkus v. Village of Yorkville*, 289 F. App'x 86, 96 (6th Cir. 2008) (Clay, J., dissenting), it has not applied this limitation to prosecutions for making "unreasonable noise" under the same provision, *State v. Carrick*, 965 N.E.2d 264, 267–68 (Ohio 2012) (holding that a defendant can violate § 2917.11(A)(2) by recklessly making noise loud enough to inconvenience, annoy, or alarm another person). Thus, Hagedorn could be prosecuted under

§ 2917.11(A)(2) and its corollary § 648.04(a)(2) if her conduct constituted "unreasonable noise," even if she was otherwise engaged in protected speech. *See id.*

This is consistent with our prior holdings. *Cf. Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002) ("Did [the plaintiff] have a constitutionally protected right to call [the defendant] an 'asshole' and castigate him as 'stupid?' The answer, we suggest, depends on the time, place, and manner in which [the plaintiff] so expressed himself."). It is also consistent with guidance from the Supreme Court regarding disorderly conduct. *See Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989) ("[I]t can no longer be doubted that government 'ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" (citation omitted) (alteration in original)); *Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." (internal quotation marks and citation omitted)).

Hagedorn's exchange with Esser at the service garage, during which she allegedly called him an "asshole" and an "idiot," did not involve fighting words. *See Greene*, 310 F.3d at 895–96 (calling a police officer an "asshole" is protected speech); *State v. Sansalone*, 593 N.E.2d 390, 392 (Ohio Ct. App. 1991) (calling a police officer an "asshole" by itself does not support a disorderly conduct charge in Ohio). There can be little dispute that Hagedorn had a clearly established right to criticize Esser in such a way without fear of retaliation. *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). But even though "the Constitution prohibits states from criminalizing conduct that disturbs solely police officers," *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 216 (6th Cir. 2011), Hagedorn did not have an unfettered right to disturb Timberlake residents while engaging in protected speech. Transky, a Timberlake

resident, filed a complaint as a result of Hagedorn's exchange with Esser. That complaint indicated that Hagedorn had been yelling and that it disturbed him. And Transky later testified that Hagedorn was "inappropriately loud" and that he could hear her yelling from his home. DE 18-1, Trial Tr., Page ID 138–39. The record indicates that Esser did not pursue a disorderly conduct charge until after Transky's complaint was filed and that the complaint was central to Esser's decision. Transky provided evidence which would allow a reasonable person to believe that Hagedorn was guilty of making unreasonable noise, in violation of § 648.04(a)(2), despite the protected nature of her speech. Thus, there was a sufficient basis for probable cause. And because probable cause supported the charge, Hagedorn cannot establish a First Amendment retaliation violation. Accordingly, Esser is entitled to qualified immunity for the disorderly conduct charge.

B.

Similarly, Hagedorn cannot establish a constitutional violation for the telecommunications-harassment charges because each charge was supported by probable cause. Thus, Cattani and Esser are both entitled to qualified immunity.[3]

Hagedorn was charged with telecommunications harassment under § 2917.21(A)(5) of the Ohio Revised Code. It provides, in relevant part, that:

> (A) No person shall knowingly make or cause to be made a telecommunication, or knowingly permit a telecommunication to be made from a telecommunications device under the person's control, to another, if the caller does any of the following:
> . . .
>> (5) Knowingly makes the telecommunication to the recipient . . . , to another person at the premises to which the telecommunication is made, or to those premises, and the recipient or another person at those premises

---

[3] Cattani also argues that he was not acting under color of state law when he submitted complaints regarding Hagedorn's harassment to the police. Because it is clear that there was probable cause to support these charges and thus no constitutional violation occurred, we need not reach that question.

> previously has told the caller not to make a telecommunication to those premises or to any persons at those premises.

Ohio Rev. Code § 2917.21(A)(5). This statute extends to communication via email. *See, e.g.*, *Pryor v. Holder*, 436 F. App'x 471, 472 (6th Cir. 2011); *Dehlendorf v. Gahanna*, No. 14AP-379, 2015 WL 5310204, at *4–7 (Ohio Ct. App. Sept 10, 2015).

The record clearly establishes that Hagedorn sent emails to Cattani's personal account after he requested that she not send any further communication to that address. The issue is not factual but legal—whether Hagedorn can be prosecuted under the statute for engaging in protected speech.

The Ohio Court of Appeals has specifically rejected the idea that § 2917.21(A)(5) infringes on First Amendment rights, holding that "the content of the [communication] is immaterial to whether [it] constitutes harassment or not." *State v. Gibbs*, 730 N.E.2d 1027, 1030–31 (Ohio Ct. App. 1999). It recognized that this interpretation construed the statute "in a manner that permits the statute to operate lawfully and constitutionally." *Id.* at 1030 (citing *Schneider v. Laffoon*, 212 N.E.2d 801, 806 (Ohio 1965)). That court also rejected an overbreadth challenge, in part, because of a "legitimate state interest in protecting citizens from unwanted intrusions into the privacy of their homes." *State v. Rettig*, Nos. 7-91-14, 7-91-15, 1992 WL 19326, at *1 (Ohio Ct. App. Feb. 3, 1992).

We agree. There was probable cause to charge Hagedorn under § 2917.21(A)(5), and nothing forecloses the statute from being applied to her conduct. We refuse to adopt Hagedorn's position that the First Amendment allows her an uninhibited right to communicate with Cattani through channels he does not use in his official capacity as mayor simply because he is a public official. In doing so, we are guided by the Supreme Court's decision in *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 737 (1970). There, the Court upheld a statute that allowed residents

to remove their names from an advertiser's mailing list. *Id.* at 738. The Court recognized the right of every person "to be let alone" and found that the "right to communicate must stop at the mailbox of an unreceptive addressee." *Id.* at 736–37. Although we have been hesitant to extend *Rowan* outside its "peculiar application to the home," *see Anderson v. Spear*, 356 F.3d 651, 661 (6th Cir. 2004) (refusing to extend *Rowan* to polling places), we find the logic of the Court's decision applicable here. A personal email account is the functional equivalent of a home mailbox. The state's interest in protecting an individual's privacy carries equal weight in both situations. For us to hold otherwise—and thus to endorse Hagedorn's conduct—"would tend to license a form of trespass." *Rowan*, 397 U.S. at 737. In the same way that Cattani could stop Hagedorn from entering onto his property to share her views about his performance, he should also be able to keep her from sending unwanted messages to a personal email address.

Additionally, we are considerably less concerned about infringing on Hagedorn's First Amendment rights because she retains multiple channels through which she can communicate with Cattani—including his official, Village of Timberlake email address. We recognize her right to speak out on a matter of public concern, but she does not have an uninhibited right to do so to an official's private email account after he asks her to stop. Officials like Cattani must be prepared to accept criticism and to be responsive to the demands of their constituents, but they are not expected to open up every aspect of their private lives for public access.

Furthermore, the implications of holding that Hagedorn could not be prosecuted for telecommunications harassment are troubling. There would be no recourse for public officials harassed at home, on a personal phone line, or at a personal email account. What Ohio has done here, by criminalizing the act of engaging in harassing communications regardless of the content, provides an effective balance of these important privacy and speech interests.

Because there was a legal basis for Esser and Cattani to pursue telecommunications-harassment charges, Hagedorn cannot establish a constitutional violation. Accordingly, both defendants are entitled to qualified immunity on these claims.

V.

Hagedorn also claims free-speech retaliation under Article I, Section 11 of the Ohio Constitution.[4] Article I, Section 11 provides, in relevant part:

> Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press.

Ohio Const. art. I, § 11. The Ohio Supreme Court has opined that this provision "does not set forth an accompanying cause of action for a violation of the right of free speech." *Provens v. Stark Cty. Bd. of Mental Retardation & Dev. Disabilities*, 594 N.E.2d 959, 961 (Ohio 1992). But the ultimate holding in *Provens* was much narrower. The court held only that:

> public employees do not have a private cause of civil action against their employer to redress alleged violations by their employer of policies embodied in the Ohio Constitution when it is determined that there are other reasonably satisfactory remedies provided by statutory enactment and administrative process.

*Id.* at 965–66; *see also Painter v. Graley*, 639 N.E.2d 51, 54 (Ohio 1994) ("*Provens* did not determine whether a private, common-law cause of action might be available to unclassified public employees or others asserting violations of constitutional rights for which statutory or administrative remedies do not exist."). The Ohio Supreme Court has never definitively held

---

[4] Here, we apply the substantive law of the forum state. *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998). We follow the Ohio Supreme Court if it has addressed the issue. *Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 326 (6th Cir. 2000). Otherwise, we look to the decisions of the Ohio Court of Appeals. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008). "[W]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability," we "choose the narrower and more reasonable path." *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014) (second alteration in original) (internal quotation marks and citation omitted).

that a private cause of action exists.[5]  *See Painter*, 639 N.E.2d at 55 (bypassing the cause-of-action analysis and dismissing the claim on the merits).  And the decisions of the Ohio Court of Appeals weigh strongly in favor of finding no private cause of action.  *See PDU, Inc. v. City of Cleveland*, No. 81944, 2003 WL 21555157, at *4–5 (Ohio Ct. App. July 10, 2003) (holding that Article I, Section 11 is "not sufficiently precise to provide clear guidance to the courts with respect to enforcement of its terms" and therefore lacked an independent or implied cause of action); *see also Autumn Care Ctr., Inc. v. Todd*, 22 N.E.3d 1105, 1110 (Ohio Ct. App. 2014) (citing *PDU, Inc.* with approval).

The district courts in this circuit have consistently found that the Ohio Constitution does not provide a private cause of action under Article I, Section 11.  *See, e.g.*, *Williams v. Nice*, 58 F. Supp. 3d 833, 839–40 (N.D. Ohio 2014); *Graham v. Johanns*, No. 2:07-cv-453, 2008 WL 3980870, at *11 (S.D. Ohio Aug. 21, 2008); *Duncan v. Village of Middlefield*, No. 1:07-cv-440, 2007 WL 4013592, at *10 (N.D. Ohio Nov. 13, 2007); *Barksdale v. City of Cleveland*, No. 1:04-cv-2130, 2006 WL 7077216, at *4 (N.D. Ohio May 5, 2006).  Some have gone so far as to hold that 42 U.S.C. § 1983 provides an "adequate remedy" under *Provens* and thus precludes any constitutional tort claim.  *See Nice*, 58 F. Supp. 3d at 839–40; *Chumley v. Miami County*, No. 3:14-cv-16, 2015 WL 859570, at *4 n.3 (S.D. Ohio Feb. 27, 2015); *Fowler v. City of Canton*, No. 5:08-cv-2350, 2009 WL 2950818, at *2–3 (N.D. Ohio Sept. 10, 2009).

In light of these decisions, along with our principle of avoiding interpretations of state law that could greatly expand liability, *see In re Darvocet, Darvon, & Propoxyphene Prods.*

---

[5] Hagedorn's reliance on the Ohio Supreme Court's declaration in *Arnold v. City of Cleveland*, 616 N.E.2d 163, 169 (Ohio 1993), that the Ohio Constitution is a "document of independent force" is misplaced.  First, this broad proposition has been narrowed.  *See Eastwood Mall, Inc. v. Slanco*, 626 N.E.2d 59, 61 (Ohio 1994).  Second, *Arnold* is factually distinguishable—it involved a constitutional challenge to a municipal ordinance, not a private damages action.  616 N.E.2d at 170–73; *see also City of Riverside v. State*, No. 26024, 2014 WL 1887714, at *9 (Ohio Ct. App. May 9, 2014) (distinguishing a private suit for damages from a case challenging the constitutionality of a statute).

*Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014), we hold that Ohio does not recognize a private

cause of action to enforce the free-speech rights enumerated in Article I, Section 11 of the Ohio

Constitution.  The district court was correct to dismiss Hagedorn's state-law claims on this basis.

VI.

For the foregoing reasons, we affirm the grant of summary judgment to defendants.